58

**KING, et al v. CONTINENTAL CASUALTY CO., et al.**
No. 76-1525.
Circuit Court, Broward County.
July 26, 1978.

Wilton L. Strickland of Ferrero, Middlebrooks & Strickland, Fort Lauderdale, for the plaintiffs.

Martin J. Sperry of Carey, Dwyer, Cole, Selwood & Bernard, Fort Lauderdale, for the defendants.

ARTHUR J. FRANZA, Circuit Judge.

*Final judgment:* This cause came on for non-jury trial on May 17, 1978 for determination of the coverage dispute between the parties remaining in this action. The disputed insurance coverage issues may be framed as follows —

I. *Whether the plaintiffs would be entitled to claim further no-fault benefits under the personal injury protection coverage carried under the CCP policy?*

II. *Whether the plaintiffs herein can "stack" the number of vehicles under the CCP policy at $10,000/$20,000 uninsured motorist coverage per car and claim against the aggregate amount thus created by such "stacking"?*

III. *Whether there is uninsured motorist coverage under the CCP policy in the amount of one million dollars that the plaintiffs can claim against for the injuries and damages sustained as a result of the accident occurring on April 12, 1974?*

IV. *Whether there is uninsured motorist coverage under the excess or umbrella policy (RDU) in the amount of ten million dollars that the plaintiffs can claim against for the injuries and damages sustained as a result of the accident of April 12, 1974?*

## Findings of fact

Upon argument of counsel, review of the trial memorandums submitted by counsel for the respective parties, and review of the numerous exhibits received in evidence, including all depositions and testimony taken in this cause, the court makes the following findings of fact —

The court has jurisdiction over the subject matter and the parties to this litigation.

The factual circumstances giving rise to this litigation are undisputed. Curtis Craig King was the Fort Myers branch manager of Hughes Supply Company (hereinafter referred to as Hughes). As part of his employment, he was provided with an automobile by his company which was insured by Continental Casualty Company, the defendant herein. On or about April 12, 1974, Curtis Craig King, 27 years of age, and Kirby Ann King, 29 years of age, his wife, and their minor children, Ashley Kirby King, 3 years of age, and Keith Craig King, 7 years of age, while occupants of the automobile owned by Hughes and provided to Curtis Craig King, were involved in an automobile accident that occurred at or near State Road 31 and State Road 74, near Punta Gorda in Charlotte County. The defendant/tortfeasor was one George S. Plantier, whose vehicle struck the vehicle occupied by the King family, after Plantier ran a flashing red light and stop sign.

As a result of the accident, Kirby Ann King, the wife of Curtis Craig King, was killed. Curtis Craig King sustained serious, extensive and permanent brain damage and other injuries, which left him a total care case unable to move, speak, or control bodily functions. The children received minor and non-permanent bodily injuries.

The decedent/tortfeasor, Plantier, was also killed in the accident. At the time of the accident, the tortfeasor was insured by Government Employees Insurance Company (GEICO) and was a resident of Broward County. Suit was instituted against the Plantier estate in the seventeenth judicial circuit, in and for Broward County, Case No. 74-13762, Farrington, J. GEICO, as the insurance company for the decedent/Plantier, paid its policy limits of $10,000/$20,000 to the plaintiffs herein and the case was settled.

Plaintiffs also made an underinsured motorist claim against Allstate Insurance Company, the insurer of the family automobile owned by the Kings. (This claim has been settled per a settlement agreement which is set forth by the court in its final judgment entered on May 17, 1978.)

The defendant in the case at bar, Continental Casualty Company, has continuously denied uninsured motorist coverage and no-fault benefits to the plaintiffs. The denial of coverage was made when plaintiffs, prior to their settlement with the decedent/tortfeasor's insurance company (GEICO) and Allstate, placed Continental on notice of an underinsured motorist claim pursuant to Fla. Stat. 627.727(2)(b).

Before the occurrence of this accident, Continental Casualty, through its agent, Joseph D. Johnson & Co., presented to Hughes a comprehensive insurance program (Plaintiff's Exhibit No. 4). This presentation was made to Hughes by the Continental Casualty representatives and one Todd Johnson of Joseph D. Johnson & Co. (Johnson deposition, June 13, 1977, at page 16, line 16 to page 17, line 23). The purpose of this proposal was to put the entire Hughes insurance needs under one general insurance program. (Johnson deposition, June 13, 1977 at page 13, line 9; page 15, line 19.) As part of this general insurance program, two policies were issued, a comprehensive liability policy, bearing policy number CCP 904-42-59 (hereinafter referred to as CCP) and an excess/umbrella policy bearing policy number RDU 806-82-43 (hereinafter referred to as RDU). (Johnson deposition June 13, 1977, at page 16, line 4, and page 25, line 18 to page 26, line 3; Weir deposition October 12, 1977 at page 11, line 17 and page 11, line 24 to page 12, line 5, and page 19, line 17; Nangle deposition, April 15, 1977 at page 7, line 16 to page 8, line 9 and page 40, line 10.)

The CCP policy is the underlying insurance policy for the RDU policy and is listed on the "schedule of underlying insurance" which is part of the RDU policy (Plaintiff's Exhibit No. 1). These policies were different in form, but there is no question, based on the evidence and testimony presented and the policies themselves that both the CCP and RDU policies, in addition to covering many other areas, also covered liability arising out of the ownership, maintenance or use of a motor vehicle as those words are used in Fla. Stat. 627.727(1) —

> "(1) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor

vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom..."

Both policies covered the automobile being operated by Curtis Craig King on the day of the accident. (Nangle deposition, April 15, 1977 at page 36, line 15 to page 36, line 25, and page 37, line 3.)

For purposes of retrospective rating, the policies were written for a term of years. However, these policies were, in fact, subject to yearly renewal on the anniversary date of December 24. Before each renewal date, a complete underwriting review of the Hughes account was conducted by the Continental Casualty underwriting division with specific attention being directed to the past and anticipated loss experience of Hughes. (Bomar deposition, pages 71 to 73). After this underwriting review was conducted, a determination was made by Continental Casualty as to the changes it would require for the upcoming year. This proposal was then transmitted to Hughes by Todd Johnson, the agent. (Bomar deposition, pages 49 to 53.) Once it was submitted to the insured, Hughes it was then up to Hughes to accept or reject the proposal. If Hughes refused to accept the proposal for the upcoming year, they were free to reject said proposal and seek insurance coverage elsewhere (Bomar deposition, pages 37-38; 72-73). In fact, the underwriting review was conducted per the agreement between the insurance company and Hughes prior to the first renewal date (Plaintiff's Composite Exhibits, Nos. 9, 10 and 11; Bomar deposition, pages 49 to 50, 72 to 73).

The court also received expert testimony from the witness presented by plaintiffs, Mr. Andrew Geller. Mr. Geller was duly qualified as an expert on insurance questions of this nature. He testified, and his testimony is unrebutted, that the Hughes program was subject to yearly renewals and that the first renewal occurred on December 24, 1973.

Turning to the facts surrounding whether or not the defendant, Continental, complied with the statutory mandates applicable to uninsured motorist coverage, plaintiffs contend that there was no compliance with Fla. Stat. 627.727(1)(1971) nor compliance with Insurance Commission Rule 4-28.02 of the Rules of the Department of Insurance; nor compliance with Fla. Stat. 627.727(1) (1973). Defendant, Continental Casualty, offers no documentation substantiating their contention that they complied with Fla. Stat. 627.727 or Rule 4-28.02, but rely, instead, upon the testimony of the agent (Todd Johnson deposition) and the depositions of the officers of Hughes as "evidence" showing compliance with the statutory requirements that an offer of uninsured motorist coverage in an amount equal to the liability coverage on both policies had been made.

The court has had the benefit of examining Continental's "subject file." (Plaintiff's Exhibit No. 12.) It is apparent in this inter-office correspondence concerning the changes of the law in uninsured and underinsured coverage, that the company was aware it might be required to offer such coverage and obtain written insurance rejections (in fact this was the procedure followed subsequently by Continental). It is also apparent from review of this file, that the company made a conscious business decision not to make offers of uninsured motorist coverage in an amount equal to liability coverage on the type of policies involved in this litigation and not to take the required rejection (For example, see Exhibit 12, memo 10/10/73).

### Conclusions of law

Based on the court's review of the evidence submitted, argument of counsel, and on this court's finding of the facts as set forth above, the court makes the following conclusions of law —

1. The first issue for this court's determination is whether the plaintiff is entitled to personal injury protection (PIP) benefits under the Continental policy. The court finds, based on the reasoning of *State Farm Mutual Automobile Insurance Company v. Kilbreath,* (4th D.C.A., opinion filed March 14, 1978), that $5,000 additional no-fault or PIP benefits are available for the claimant, Craig King, to claim against to the extent that there are provable damages compensable under PIP.

2. In Issue II, plaintiff seeks to "stack" the number of vehicles insured under the two insurance policies which have been previously discussed. Hughes did have insured under the two policies in question a fleet of vehicles. Plaintiffs contend that they should be allowed to "stack" individual coverages of $10,000/$20,000 of uninsured motorist's coverage per vehicle and be allowed to claim their damages against the total. Plaintiffs' counsel, as the record will reflect, admit that the case of *Travelers v. Pac.* 337 So.2d 397 (2nd D.C.A. 1976), was on point and adverse to their position on this issue. However, evidence was offered and received during the course of the trial that the plaintiff, Craig King, did contribute to an insurance premium fund managed by Hughes to purchase collision coverage on the company car furnished to him. This was paid, as the record reflects, individually by plaintiff, and those other employees with the Hughes organization who fell within his type of job description and were, like Craig King, provided with a company car. (Weir deposition of May 10, 1978, at page 32; 40-41.) Collision coverage was required by Hughes with the employee having the option of either paying a premium to the premium fund used for purchasing the additional coverage, or agreeing to be per-

sonally responsible should any collision damage be done to the vehicle.

Notwithstanding argument of counsel that this contribution to the insurance premium fund by Craig King for collision coverage under a separate policy (Plaintiffs' Exhibit No. 3) distinguishes the instant case from *Travelers v. Pac,* supra, it is this court's determination that under a fleet policy of this type, the plaintiff, employee, cannot "stack" the vehicles to increase coverage.

3. The remaining issues are those raised in Issues III and IV.

As was set forth in the findings of fact, these two policies formed part of a general insurance program and were part of a single insurance package sold by Continental Casualty Company to Hughes. As such, they clearly meet the criteria in *Aetna Casualty & Surety v. Green,* 327 So.2d 65 (1st DCA 1976), cert. denied, 336 So.2d 1179. Both the CCP and RDU policies are "automobile liability policies, within the meaning of Fla. Stat. 627.727(1)". Coming within that definition, they become subject to the mandatory requirements that an offer of uninsured motorist coverage be made in an amount equal to the liability coverage of said policy. The liability coverage under the CCP policy is $1,000,000; the liability coverage under the RDU policy is $10,000,000. The issues that this court must resolve in determining whether or not such uninsured coverage in those amounts is present under these policies are as follows —

A. Was the mandatory offer of uninsured motorist coverage in an amount equal to the liability limits made under the CCP policy and the RDU policy?

B. If there was such an offer, as required by the statute, was there a valid waiver or rejection effected by the insured and Continental as to this coverage?

We first look to Fla. Stat. 627.727(2)(b). This statute says in part as follows —

(2) For the purpose of this coverage, the term "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle when the liability insurer thereof:

(b) Has provided limits of bodily injury liability for its insured which are less than the limits applicable to the injured person provided under his uninsured motorist's coverage.

This statutory section expanded the definition of an *uni*nsured motor vehicle.

Continental Casualty argues that since the car occupied by the plaintiffs was owned by Hughes, plaintiffs cannot make an *under*insured claim. Continental relies on *GEICO v. Taylor*, 342 So.2d 54 (1st D.C.A. 1977); *Main Insurance Co. v. Wiggins*, 349 So.2d 638 (1st D.C.A. 1977); *Sanchez v. Vigilant Insurance Co.*, 345 So.2d 396 (3rd D.C.A. 1977). Both *GEICO v. Taylor* and *Main Insurance Co. v. Wiggins*, attempt to draw a distinction between *uni*nsured and *under*insured insurance as it applies to the named insured and members of his household as opposed to other occupants of the named insured's vehicle. These decisions say that *under*-insured coverage is not available to occupants of the named insured's vehicle when that vehicle is involved in an accident with another automobile that carries liability coverage in an amount less than the insured motorist coverage on the named insured's automobile. This attempt to distinguish between *uni*nsured claims and *under*-insured claims restricts the class of injured persons protected, whereas the statute expanded coverage.

It is the court's opinion, that, *GEICO v. Taylor* and *Main Insurance Co. v. Wiggins*, notwithstanding, the controlling law for determination of who is an insured under the policies in question is *Mullis v. State Farm*, 252 So.2d 229 (Fla. 1971).

In Mullis, the Supreme Court stated at page 233 as follows —

When uninsured motorist coverage was obtained by Shelby Mullis pursuant to Section 627.0851 for himself as the named insured, for his spouse and for his or his spouse's relatives who are residents of his household, they were given the same protection in case of bodily injury as if the uninsured motorist had purchased automobile liability insurance in compliance with the Financial Responsibilty Law. This, of course, would not be the case as to other persons potentially covered who are not in the class of the named insured and relatives resident in the Mullis household. *These latter are protected only if they receive bodily injury due to the negligence of an uninsured motorist while they occupy the insured automobile of the named insured with his permission or consent. This latter group is necessarily restricted to occupants of the insured automobile for the purpose of coverage identification and to show their insurable relationship to the named insured in automobile liability policies.* However, this is not true as to the named insured and the protected relatives resident in his household. (Emphasis added)

The automobile was insured not only under the CCP policy, but the RDU policy as well (Johnson deposition, page 22-23). Since this was an insured vehicle under these two insurance policies, the

coverages found under these policies extend to this particular car and would, in an insured (underinsured) motorist claim situation, inure to the benefit of the plaintiff and his family "... *while they occupy the insured automobile of the named insured with his permission or consent ...*" (*Mullis,* supra, at p. 233). The fact that this claim is an "underinsured" claim in that it falls within the expanded definition of the uninsured motorist law as set forth in Fla. Stat. 627.727(2)(b) does not, in this court's mind, alter the basic fact that this is nothing more than an uninsured motorist claim. The distinction between *un*insured and *under*insured as set forth in *GEICO v. Taylor,* and *Main Insurance Co. v. Wiggins,* is not one which comports with the expanded statutory definition, nor with the rationale of the Florida Supreme Court in the *Mullis* decision. See also, *Great American Insurance Co. v. Pappas,* 345 So.2d 823 (4th D.C.A. 1977); and *Arrieta v. Volkswagen Insurance Co.,* 343 So.2d 918 (3rd D.C.A. 1977). Therefore, under the CCP and RDU policies, there would be the full amount of uninsured motorist coverage on that vehicle whether there existed any other vehicle insured under the fleet policy or not. In other words, this coverage exists for the individual vehicle involved in this accident and its occupants regardless of the number of vehicles insured under these policies.

The next question is whether or not Continental Casualty complied with the requirements of Fla. Stat. 627.727(1) in making the necessary offer and taking the necessary informed rejection of uninsured motorist coverage in an amount equal to the liability limits of these two policies.

Fla. Stat. 627.727(1) *(1971)* reads as follows —

(1) *No automobile liability insurance* covering liability arising out of the ownership, aintenance, or use of any motor vehicle *shall be delivered or issued for delivery* in this State with respect to any motor vehicle registered or principally garaged in this State *unless coverage is provided* therein or supplemental thereto, in not less than the limits described in Section 324.021(7), and *in an amount up to one hundred percent of the liability insurance purchased by the named insured for bodily injury, under provisions filed with and approved by the department,* for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom; provided, however, that the coverage required under this section shall not be applicable when, or to the extent that, any insured named in the policy shall reject the coverage; . . . (emphasis added)

Fla. Stat. 627.727(1) *(1973)* reads as follows —

(1) *No automobile liability insurance* covering liability arising out of the ownership, maintenance, or use of any motor vehicle *shall be delivered or issued for delivery* in this State with respect to any motor vehicle registered or principally garaged in this State *unless coverage is provided* therein or supplemental thereto *in not less than the limits of the liability insurance purchased by the named insured for bodily injury,* [or such lower limits complying with the company's rating plan as may be selected by the named insured.] *under provisions filed with and approved by the department,* for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, however, that the coverage required under this section shall not be applicable when, or to the extent that, any insured named in the policy shall reject the coverage; . . . (emphasis added)

The legislative mandate of these statutes (in effect in 1972 and 1973) was that an offer of uninsured motorist coverage must be made in an amount equal to the automobile liability coverage.

Pursuant to Fla. Stat. 627.727(1), the Department of Insurance promulgated Rule 4-28.02 which reads as follows —

4-28.02   Increased limits — uninsured motorist. — Chapter 71.88, Laws of the State of Florida, as respects the provision for increased uninsured motorist coverage limits, is applicable to policies with effective dates or renewal dates on or after January 1, 1972. *Evidence must be maintained by the company that such coverage was offered in limits up to the bodily injury limits of liability applicable to the policy.* The applicant or insured may accept limits for uninsured motorist coverage in an amount less than the bodily injury limits of the policy.

General authority 624.308, 120.031 F.S. Law implemented 627.727 F.S. History-News 12-19-71. (emphasis added)

Continental's files do not reflect the presence of any evidence whatsoever which establishes that the offer, required by the statute, had been made. Instead, Continental relies on verbal testimony given by the principals of Hughes that even had the coverages been offered, they would have rejected them. The deposition testimony of David Hughes, William Weir, Ed Nangle and Todd Johnson, the agent, are conflicting as to exactly what was done and said during the period of negotiation and issuance of the policies in question. However, taking all of the testimony offered, in its most

favorable light to the defendant, it is clear that the defendant, Continental, did not make the required offer (either verbal or written) in an amount equal to the liability limits under the CCP policy ($1,000,000) or under the RDU policy ($10,000,000).

Continental Casualty did not comply with the law in effect when these policies were issued, nor with the law as it existed at the time of the first renewal on December 24, 1973. Unless such coverage was offered pursuant to the statute in limits equal to the liability limits, there is no compliance with the law [*Lumbermens Mutual Casualty Co. v. Beaver*, 344 So.2d 441 (4th D.C.A. 1978).]

Continental Casualty's reliance on the verbal testimony from the officers of Hughes Supply and the agent, Todd Johnson, is misplaced. This is not and cannot be a valid defense to Continental's failure to comply with the statutory requirements mandating the offer of this particular coverage and maintenance by the company of some evidence of the offer. For the creation of a contract, such as an insurance policy, mutual assent is necessary and this is expressed by an offer and acceptance. In addition, the offer, which is a prerequisite to the formation of the contract, must comply with existing statutory requirements. Although the offer may be made verbally or in writing it must be made in a clear and unambiguous manner and complete in all its terms in order for there to be an informed acceptance or rejection. Therefore, based on the evidence submitted to this court, it is this court's factual determination that no such offer, with the attendant legal formality, was made by the defendant, Continental. In view of the above, there could not have been an informed rejection.

The invalidity of Continental's argument is further illustrated by *Aetna Casualty & Surety Co. v. Green*, supra. The *Green* decision is important as to whether an offer was made as well as whether or not there was an informed rejection. Although in *Green* the question went primarily there to the umbrella or excess policy, the decision applies with equal force to any policy within the definition of an automobile liability policy as set forth in Fla. Stat. 627.727(1). The court in *Green* clearly stated that regardless of a knowlegeable rejection on the basic or underlying policy, if there was no offer on the excess or umbrella policy, which fell within the statutory definition, and which was a separate policy, then by operation of the statute uninsured motorist coverage was afforded under that policy in an amount equal to the liability limits of the policy in question. (See also, *Beaver*, supra.) The RDU policy in the case at bar meets all of these criteria.

Subsequent to the occurrence of the accident, the defendant, Continental, began to retain written rejections signed by officers of the insured. This is certainly a better procedure and would prevent post occurrence parol testimony by interested parties as to whether or not an offer was made and the coverage rejected. However this court is not required to determine whether or not such written or tangible evidence need be obtained by the company and retained in its files since under the facts of this case, the court has found, based upon all of the evidence, that there was no offer made, nor did the defendant, Continental, comply with the statutory or rule requirements. *(Aetna Casualty & Surety v. Green,* supra; *Lumbermens Mutual v. Beaver,* supra).

By this failure, there is available to claim against, to the extent the plaintiffs herein can prove their damages the following coverages under the two policies in question —

> Under CCP 904-42-59, there is $1,000,000 in uninsured motorist coverage for the plaintiffs to claim against.

> Under RDU 86-82-43, there is $10,000,000 in uninsured motorist coverage for the plaintiffs to claim against.

It is therefore ordered and adjudged as follows —

1. Five thousand dollars additional no-fault or PIP benefits are available for the plaintiffs to claim against to the extent that there are provable damages compensable under PIP.

2. The plaintiffs cannot "stack" the total number of vehicles under the CCP policy so as to increase the available uninsured motorist coverage.

3. Under Continental Casualty Company's Policy CCP 904-42-59, there is one million dollars in uninsured/underinsured motorist coverage available for the plaintiffs to claim against to the extent that there are provable damges.

4. Under Continental Casualty Company's Policy RDU 806-82-43, there is ten million dollars in uninsured/underinsured motorist coverage available for the plaintiffs to claim against to the extent that there are provable damages.

5. The court retains jurisdiction for further determination of all remaining issues, including, but not limited to, negligence liability, damages and attorney's fees and costs, to be heard upon proper notice and motion by either party.